T.C. Memo. 1998-227


UNITED STATES TAX COURT


JERRY S. PAYNE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 980-95, 26812-95.          Filed June 29, 1998.


Jerry S. Payne, pro se.

<u>Richard C. Cummings</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


SWIFT, <u>Judge</u>:  Respondent determined deficiencies in and additions to tax with regard to petitioner as follows:

Docket No. 980-95

| Year | Deficiency | Additions to Tax | | |
|------|-----------|------------------|---|---|
| | | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
| 1987 | $172,310 | $128,693 | * | $43,078 |

    * 50 percent of interest payable under sec. 6601 with respect
      to portion of underpayment attributable to fraud.

Docket No. 26812-95

| Year | Deficiency | Additions to Tax | | | |
|------|-----------|------------------|---|---|---|
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec.6653(b)(1) | Sec. 6661 |
| 1988 | $653,048 | $15,233 | $3,047 | $444,087 | $163,262 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issues for decision are: (1) Whether petitioner received legal fees and other income that he did not report on his Federal income tax returns; (2) the value of stock petitioner received in September of 1988 as income; (3) whether for 1988 petitioner is to be charged with discharge of indebtedness income; (4) whether for 1988 a corporation petitioner controlled made a valid S election; (5) whether for 1987 and 1988 petitioner is entitled to certain claimed deductions; and (6) whether for 1987 and 1988 petitioner is liable for the fraud addition to tax.

Because of the inadequacy of petitioner's books and records, respondent used a combination of the specific item and bank deposits methods of proof in determining significant increases to petitioner's income over that reported on petitioner's income tax returns. Respondent also disallowed claimed deductions, made other

adjustments, and charged petitioner with the fraud addition to tax for each year.

Respondent's adjustments and the capacity in which various funds, bank deposits, and stock were received by petitioner, whether they constitute taxable income to petitioner, the deductibility of the disputed deductions, and respondent's imposition of the fraud addition to tax are the subject of much confusion and disagreement between the parties. Certain items of income and deductions have been conceded. Also, petitioner now claims additional deductions that were not reflected on his Federal income tax returns and that were not properly raised in his pleadings.

FINDINGS OF FACT

When the petitions were filed, petitioner resided in Houston, Texas.

During the years in issue, petitioner practiced law primarily as a litigation specialist, and petitioner owned and operated in Houston, Texas, a law firm under the name of Payne & Associates. Petitioner provided extensive legal representation to and eventually managed, controlled, and owned the stock of 2618, Inc. (2618 Inc) a corporation that owned and operated in Houston, Texas, a topless dance club under the name of Caligula XXI (the Club).

During part of the years in issue, Gerhard Helmle (Helmle) owned 50 percent of the stock of 2618 Inc, and he assisted in managing operations of the Club. Petitioner also provided legal

- 4 -

representation to Helmle in criminal proceedings against Helmle for possession of illegal drugs.

During the years in issue, petitioner provided management services to and was actively involved in the business operations of 2618 Inc and of the Club. Petitioner's involvement in the business operations of 2618 Inc and of the Club increased as petitioner became concerned that 2618 Inc and Helmle might not be able to pay legal fees owed to petitioner in excess of $500,000.

During 1986 through 1988, petitioner received funds relating to various transactions and litigation involving Helmle, 2618 Inc, the Club, and other entities and activities. Those funds were generally deposited into petitioner's bank accounts, and portions of the funds were then disbursed out of petitioner's bank accounts for and on behalf of 2618 Inc and the Club, on whose behalf portions of the funds had been received by petitioner; other portions of the funds were used by petitioner for his personal purposes.

For the years in issue, petitioner failed to maintain adequate books and records for his law firm, and adequate books and records were not maintained for 2618 Inc and for the Club.

Houston Ordinance No. 86-323

During 1986 through 1988, petitioner provided legal representation to 2618 Inc and to the Club in litigation against the City of Houston involving Houston Ordinance No. 86-323. The ordinance was passed by the City of Houston on March 5, 1986, and

provided that no two topless dance clubs could operate within 1,000 feet of each other and that topless dance clubs were required by April 4, 1986, to apply to the City of Houston for a permit to conduct a sexually oriented business (SB).

The Club had applied timely for an SB permit, but on April 25, 1986, because the Club was located within 1,000 feet of Texas Cowgirls (another topless dance club that purportedly had been in existence longer than the Club), its application for an SB permit was denied. Under the denial order, the Club was to be permitted to remain in operation until March 31, 1990, so that the owners could recoup their capital investments in 2618 Inc and in the Club.

In 1986, petitioner initiated litigation on behalf of 2618 Inc against the City of Houston, Texas Cowgirls, and its successor, the Body Shoppe, involving the denial of the SB permit. The primary underlying issue in the litigation concerned whether the Club or Texas Cowgirls had been in operation longer.

Litigation over the SB permit negatively affected the value of 2618 Inc and of the Club, and without an SB permit continued operation of the Club was in doubt.

On November 27, 1989, during a hearing before the District Court of Harris County, Texas, with regard to the SB permit, Helmle testified that the market value of the Club with an SB permit would be at least $2 million. Helmle also submitted a report at the hearing in which he represented that since 1980 the Club had made an average of over $2 million in gross alcoholic beverage sales per year

and that the Club, with an SB permit, would earn a net profit of over $1 million per year.

On March 14, 1990, in the above litigation, the City of Houston decided in favor of the Club and issued the Club an SB permit for an indefinite period of time.

Mixed Beverage Permit Issue

During the years in issue, petitioner also provided extensive legal representation to 2618 Inc and to the Club in litigation against the Texas Alcoholic Beverage Commission (TABC).

During 1987, largely because of the criminal charges pending against Helmle, TABC refused to renew the Club's two mixed beverage permits necessary to sell alcohol to patrons. Sales of alcoholic beverages constituted the majority of the Club's gross receipts. As discussed further below, in order to increase the likelihood of receiving mixed beverage permits from TABC, petitioner nominally arranged to buy out Helmle's stock interest in 2618 Inc.

After TABC failed to act on the Club's application for the mixed beverage permits, petitioner filed suit in a State court against TABC on behalf of 2618 Inc and the Club seeking actual damages of $2 million and punitive damages of $10 million.

In August of 1988, a settlement agreement was reached between TABC and the Club wherein no damages were awarded, but TABC agreed to issue the mixed beverage permits to the Club effective September 20, 1988.

$55,753 and $275,000 Loans From TexAmBkSW and TexGuarantyBk

In 1986, a $55,753 loan was obtained from Texas American Bank South West (TexAmBkSW) on behalf of 2618 Inc but nominally in the name of petitioner.

In 1987, a $275,000 loan was obtained from Texas Guaranty National Bank (TexGuarantyBk) on behalf of 2618 Inc but nominally in the name of petitioner.

The $55,753 in loan proceeds received from TexAmBkSW was used in 1986 to pay a portion of Helmle's legal fees owed to petitioner. On his 1986 Federal income tax return, petitioner reported his receipt of the $55,753 as taxable income.

In 1987 and 1988, petitioner received additional funds from 2618 Inc that he used to make payments of principal and interest to TexAmBkSW on the $55,753 loan. The following schedule reflects for 1987 and 1988 the funds that petitioner received from 2618 Inc to make payments on the $55,753 loan and the principal and interest that petitioner paid to TexAmBkSW on the loan.

| Year | Funds Received from 2618 Inc | Funds Paid to TexAmBkSW on $55,753 Loan As Principal | As Interest |
|------|------|------|------|
| 1987 | $27,500 | $23,272 | $4,228 |
| 1988 | 10,000 | 9,598 | 402 |

The $275,000 in loan proceeds received from TexGuarantyBk was used on behalf of 2618 Inc to redeem a 50-percent stock interest in 2618 Inc that was held by Spiro Kalantzakis.

In 1987 and 1988, petitioner received additional funds from 2618 Inc, and he used those funds (with the exception of $17,281 that was used by petitioner in 1988 for personal purposes) to make payments of principal and interest to TexGuarantyBk on the $275,000 loan. The following schedule reflects for 1987 and 1988 the funds petitioner received from 2618 Inc to make payments on the $275,000 loan and the principal and interest that petitioner paid to TexGuarantyBk on the loan.

| Year | Funds Received from 2618 Inc | Funds Paid to TexGuarantyBk on $275,000 Loan | |
|------|------------------------------|---------------------------|---------------|
|      |                              | As Principal | As Interest |
| 1987 | $ 90,900 | $68,751 | $22,149 |
| 1988 | 121,200 | 91,668 | 12,251 |

For 1988, on its corporate Federal income tax return, 2618 Inc deducted as a business expense for legal fees the above $121,200 in funds that it paid to petitioner relating to the $275,000 loan.

Funds Received From 2618 Inc as Legal and Management Fees

During 1987, petitioner received funds from 2618 Inc and from the Club as legal and management fees in the following amounts:

| Year | Funds Received from 2618 Inc | |
|------|--------------|------------------|
|      | As Legal Fees | As Management Fees |
| 1987 | $108,713 | $67,500 |
| 1988 | 52,881 | 90,000 |

## Withdrawals of Cash From Cash Registers of 2618 Inc

During 1987 and 1988, respectively, petitioner withdrew a total of $6,721 and $4,699 in cash from the cash registers at the Club and used this cash for personal purposes.

## Payne & Potter

In 1987, petitioner received $12,826 relating to his ownership of 50 percent of the stock of a real estate development corporation doing business under the name of Payne & Potter. This $12,826 relates to the disposition of certain real estate held by Payne & Potter.

During the years in issue, Payne & Potter did not maintain adequate books and records. By the end of 1987, Payne & Potter was insolvent.

## Legal Fees From Miscellaneous Clients

In 1987 and 1988, petitioner received $65,498 and $33,376, respectively, for legal services he provided to clients other than 2618 Inc and the Club.

## Miscellaneous Bank Deposits and Checks Not Deposited

For 1987 and 1988, petitioner received $205,262 and $198,522, respectively, in miscellaneous additional funds that were deposited into his bank accounts. For 1987, petitioner also received an additional $5,426 in checks that were not deposited into his bank accounts.

The record does not indicate the nature of the above funds that petitioner received during 1987 and 1988.

Summary of Total Funds Received by Petitioner

As summarized below, the evidence indicates that in 1987 and 1988, petitioner received at least $590,346 and $510,678, respectively, in total funds from all sources. As indicated, with the exception of $56,958 in 1987 and $4,699 in 1988, the funds petitioner received in each year were deposited into petitioner's bank accounts:

1987
Funds Received by Petitioner

| Relates To | Amount | Funds Deposited Into Petitioner's Bank Accts | Funds Not Deposited Into Bank Accts |
|---|---|---|---|
| $55,753 TexAmBkSW Loan | $ 27,500 | $ 5,000 | $22,500 |
| Legal Fees from 2618 Inc | 108,713 | 88,402 | 20,311 |
| Mgmt Fees from 2618 Inc | 67,500 | 67,500 | -0- |
| $275,000 TexGuarantyBk Loan | 90,900 | 90,900 | -0- |
| Withdrawals of Cash from the Club | 6,721 | -0- | 6,721 |
| Payne & Potter | 12,826 | 12,826 | -0- |
| Other Legal Fees | 65,498 | 63,498 | 2,000 |
| Misc. Bank Deposits | 205,262 | 205,262 | -0- |
| Misc. Checks Not Deposited | 5,426 | -0- | 5,426 |
| Total | $590,346 | $533,388 | $56,958 |

1988
Funds Received by Petitioner

| Relates To | Amount | Funds Deposited Into Petitioner's Bank Accts | Funds Not Deposited Into Bank Accts |
|---|---|---|---|
| $55,753 TexAmBkSW Loan | $ 10,000 | $ 10,000 | $ -0- |
| Legal Fees from 2618 Inc/Club | 52,881 | 52,881 | -0- |
| Mgmt Fees from 2618 Inc/Club | 90,000 | 90,000 | -0- |
| $275,000 TexGuarantyBk Loan | 121,200 | 121,200 | -0- |
| Cash Withdrawals from the Club | 4,699 | -0- | 4,699 |
| Other Legal Fees | 33,376 | 33,376 | -0- |
| Misc. Bank Deposits | 198,522 | 198,522 | -0- |
| Total | $510,678 | $505,979 | $4,699 |

- 11 -

Petitioner's Receipt of Property and Stock of 2618 Inc

By the end of 1987, as a result of the outstanding legal fees in excess of $500,000 owed to him by 2618 Inc and by Helmle, petitioner began exercising increasing control over the finances and operations of 2618 Inc and of the Club.

On February 15, 1988, ownership interests in certain intangible and tangible personal property relating to the Club (namely, 2618 Inc's leasehold interest in the building in which the Club operated, the equipment, leasehold improvements, furniture and fixtures located in the building, and the right to use the Caligula XXI name) were transferred to petitioner in satisfaction of a portion (namely, $35,000) of the legal fees owed to petitioner. Petitioner then leased the above property back to 2618 Inc.

In 1988, ownership of all of the outstanding stock of 2618 Inc was transferred from Helmle to petitioner in further payment of legal fees that 2618 Inc and Helmle owed to petitioner.

As indicated above, largely on account of the criminal charges pending against Helmle, TABC had denied the Club the mixed beverage permits required to sell alcoholic beverages to patrons. During 1988, petitioner had actively sought a buyer for Helmle's interest in 2618 Inc, but he was unsuccessful. Transfer of the stock of 2618 Inc to petitioner therefore served the additional purpose of eliminating Helmle as one of the stockholders of 2618 Inc.

The transfer to petitioner of the stock of 2618 Inc took the form of a purchase. Nominally, petitioner agreed to purchase Helmle's stock in 2618 Inc for a stated consideration of $10 in cash and a $500,000 promissory note. Petitioner, however, was not personally liable on the $500,000 promissory note, and petitioner never made any payments on the promissory note.

The purported stock purchase agreement between petitioner and Helmle, dated March 15, 1988, was conditional and provided that the transfer to petitioner of the stock of 2618 Inc would not be effective unless and until TABC granted 2618 Inc's application for mixed beverage permits. On July 5, 1988, petitioner and Helmle reduced the stated principal amount of the promissory note that had been executed by petitioner in favor of Helmle from $500,000 to $300,000. Petitioner also was not personally liable on the revised $300,000 promissory note, and petitioner never made any payments on the $300,000 promissory note.

In 1988, before conditions associated with the transfer of the stock were satisfied, petitioner represented himself to third parties as the sole stockholder of 2618 Inc.

On September 20, 1988, the litigation with TABC essentially was resolved, 2618 Inc was issued mixed beverage permits, and transfer to petitioner of the outstanding stock of 2618 Inc became effective.

In fact, the purported March 15, 1988, agreement under which petitioner was to purchase from Helmle the stock of 2618 Inc was a

sham, and petitioner received the stock of 2618 Inc not by purchase, but in payment and in satisfaction of the over $500,000 in legal fees owed to him by 2618 Inc and by Helmle.

During 1986 through 1988, in correspondence to various individuals, petitioner made statements regarding the value of the stock of 2618 Inc and of the Club. The following schedule summarizes petitioner's statements:

| Date | Description |
| --- | --- |
| 09/19/86 | Letter to hearing officer for City of Houston in which petitioner stated that the market value of the Club was between $1 million and $1.5 million. |
| 02/11/87 | Letter to loan officer for TexGuarantyBk in which petitioner stated that the Club could be sold for $1.5 million. |
| 06/05/87 | Letter to district judge for Harris County, Texas, in which petitioner stated that the market value of the Club was between $1 million and $1.5 million. |
| 11/17/87 | Letter to Kalantzakis in which petitioner stated that a 50-percent stock interest in 2618 Inc had a value of over $700,000 and that an individual had offered to purchase the Club for $1 million. |
| 02/29/88 | Letter to Helmle in which petitioner stated that an offer had been received to purchase a 50-percent stock interest in 2618 Inc for $600,000. |

## Relief as Guarantor of $705,000 Debt Obligation

On March 14, 1985, Payne & Potter borrowed $705,000 from Texas Commerce Bank in Houston (TexCommBk) to develop four luxury condominium units on a golf course in Lakeway, Texas. Petitioner was shown on the loan documentation as guarantor of this $705,000 loan.

By 1987, apparently because of the declining regional real estate market, Payne & Potter defaulted on its $705,000 debt obligation to TexCommBk. During 1987 and 1988, petitioner made

payments totaling $76,361 and $19,139, respectively, to TexCommBk in connection with his guaranty of this $705,000 loan.

On October 3, 1988, petitioner and TexCommBk entered into a restructuring agreement under which several loans between petitioner and TexCommBk and petitioner's liability as guarantor of the above $705,000 loan were restructured.  Under the restructuring agreement, in full satisfaction of petitioner's liability as guarantor of the $705,000 loan, petitioner agreed to pay $105,000 and other amounts to TexCommBk and to assign to TexCommBk certain rent receivables.  In addition, two parcels of real estate that were held by Payne & Potter were transferred to TexCommBk in further payment on the $705,000 loan.

For 1988, TexCommBk mailed a Form 1099 to respondent and to Payne & Potter reflecting that Payne & Potter had realized discharge of indebtedness income of $349,500 in connection with the above restructuring agreement.  This $349,500 apparently was calculated on the basis of the unpaid principal balance of the $705,000 loan less the $105,000 that petitioner agreed to pay TexCommBk and less the value of the two parcels of real property that were transferred to TexCommBk.  The unpaid principal balance of the $705,000 loan and the value of the two parcels of real property are not in evidence.

Payments Made to Banks

As indicated above, in addition to the deposits petitioner made into his bank accounts, during 1987 and 1988, petitioner made

significant payments to various banks. The payments apparently related to various personal and business obligations that petitioner owed to the banks, such as petitioner's guaranty of the $705,000 TexCommBk loan. Petitioner's books and records, however, and the evidence herein, generally fail to establish either the specific nature of the payments (whether principal or interest) and/or the specific nature of the related debt obligations (whether personal or business). The schedule below summarizes the payments that petitioner made to the various banks and, where established in the record, indicates the general nature of the payments:

| Bank | Nature of Payments | 1987 | 1988 |
|------|--------------------|------|------|
| TexGuarantyBk | | $119,146 | $ 58,702 |
| TexCommBk | Guarantor $705,000 Debt | 76,361 | 19,139 |
| TexCommBk | | 16,763 | 11,669 |
| TexAmBkSW | | 7,254 | 10,361 |
| Merabank | Mortgage on Residence | 19,402 | 30,666 |
| Savings Banc | | 3,658 | 4,482 |
| Other Banks | | 27,069 | 250 |
| | Total | $269,653 | $135,269 |

Forms 1099-INT that respondent received relating to petitioner for 1987 and 1988 indicate that petitioner paid the following interest expenses:

| | Interest Paid | |
|------|------|------|
| Bank | 1987 | 1988 |
| Merabank | $15,965 | $27,397 |
| TexGuarantyBk | 9,204 | 12,251 |
| TexCommBk | 13,526 | 20,336 |
| TexAmBkSW | 7,254 | -- |
| Savings Banc | 2,079 | -- |
| Total | $48,028 | $59,984 |

## False Information Submitted to Banks

During 1984 through 1988, petitioner submitted falsified financial documents and falsified copies of his Federal income tax returns that misstated his net worth and income to various banks and other financial institutions.

## Petitioner's Books and Records Relating to Expenses

For 1987 and 1988, petitioner's records generally fail to adequately establish and substantiate the nature and amount of expenses that petitioner incurred.

## Petitioner's Federal Income Tax Returns and Respondent's Audits

On October 13, 1988, and on October 28, 1989, petitioner filed his 1987 and 1988 Federal income tax returns on which petitioner reported, among other things, the following:

|  | 1987 | 1988 |
|---|---|---|
| Gross Receipts from Law Practice | $232,438 | $189,788 |
| Business Interest Income | 9,254 | 2,189 |
| Less: |  |  |
|     Cost of Goods Sold | 17,201 | 49,596 |
|     Other Business Expenses | 230,767 | 147,993 |
|        Net Business Loss | ($ 6,276) | ($ 5,612) |
| Other Income | -- | 32,326 |
| Less Itemized Deductions | -- | 35,057 |
|        Net Tax Loss | ($ 6,276) | ($ 8,343) |

Apparently because of the reported business loss and the absence of other reported income, petitioner did not claim any itemized or standard deductions on his 1987 Federal income tax return as filed.

The record herein does not indicate specifically the source and nature of the income that petitioner included in the gross receipts and business interest income figures that were reported on his 1987 and 1988 Federal income tax returns. Thus, we do not know specifically how, if at all, petitioner treated on his 1987 and 1988 Federal income tax returns the various funds that petitioner received from 2618 Inc, from Payne & Potter, and from other sources.

On his 1988 Federal income tax return, petitioner did not report any income relating to the stock of 2618 Inc that he received in payment of outstanding legal fees, and he did not report any income relating to relief from his liability as guarantor of the $705,000 TexCommBk loan.

As indicated, on audit, because of the inadequacy of petitioner's books and records, respondent reconstructed petitioner's taxable income for 1987 and 1988 using the specific item and the bank deposits methods of proof. Respondent disallowed many claimed business and itemized deductions, and respondent asserted the fraud and substantial understatement additions to tax.

With regard to the income adjustments, respondent determined that petitioner for 1987 and 1988 had additional unreported business income relating to his law practice of $154,667 and $2,114,700,

respectively.  This alleged additional income is based primarily on the unexplained deposits into petitioner's bank accounts, the alleged value of the stock of 2618 Inc that petitioner received in 1988, and the alleged discharge of indebtedness income relating to petitioner's relief from liability as guarantor of the $705,000 TexCommBk loan.

In an amended answer for 1988, respondent asserted that $91,668 in additional flow-through income from 2618 Inc should be taxable to petitioner on the grounds that 2618 Inc was an S corporation and the $91,668 was improperly deducted on 2618 Inc's Federal income tax return as legal fees.

The following schedules reflect the deductions as claimed on petitioner's 1987 and 1988 Federal income tax returns and the amount thereof allowed and disallowed by respondent in respondent's notices of deficiency:

| | 1987 Business Deductions | | |
|---|---|---|---|
| Item | Amount Claimed On Return | Amount Allowed By Respondent | Amount Disallowed By Respondent |
| Temporaries and Steno | $  8,712 | -0- | $  8,712 |
| Materials and Supply | 3,710 | -0- | 3,710 |
| Depositions, Court Costs | 4,779 | -0- | 4,779 |
| Bad Debts | 22,826 | -0- | 22,826 |
| Dues and Publications | 623 | $  623 | -0- |
| Insurance | 6,933 | 6,933 | -0- |
| Interest | 149,137 | -0- | 149,137 |
| Rent and Utilities | 24,317 | -0- | 24,317 |
| Taxes | 2,861 | -0- | 2,861 |
| Travel, Meals, etc. | 3,212 | -0- | 3,212 |
| Telephone | 3,564 | 3,564 | -0- |
| Parking | 3,248 | -0- | 3,248 |
| Auto & Plane | 14,051 | -0- | 14,051 |
| Error Correction | (5) | -0- | (5) |
| Total | $247,968 | $11,120 | $236,848 |

#### 1988 Business Deductions

| Deduction | Amount Claimed On Return | Amount Allowed By Respondent | Amount Disallowed By Respondent |
|---|---|---|---|
| Temporaries and Steno | $ 30,677 | -0- | $ 30,677 |
| Labor | 11,999 | -0- | 11,999 |
| Depos., Court Costs, etc. | 6,920 | -0- | 6,920 |
| Dues and Publications | 850 | $ 850 | -0- |
| Insurance | 10,366 | 10,366 | -0- |
| Interest | 69,622 | -0- | 69,622 |
| Rent and Utilities | 27,704 | -0- | 27,704 |
| Taxes | 6,678 | -0- | 6,678 |
| Travel, Meals, etc. | 2,674 | -0- | 2,674 |
| Telephone | 8,474 | -0- | 8,474 |
| Parking | 4,728 | -0- | 4,728 |
| Auto and Plane | 16,897 | -0- | 16,897 |
| Total | $197,589 | $11,216 | $186,373 |

#### 1988 Itemized Deductions

| Item | Amount Claimed On Return | Amount Allowed By Respondent | Amount Disallowed By Respondent |
|---|---|---|---|
| Medical and Dental | $16,321 | -0- | $16,321 |
| Taxes | 5,076 | $ 5,076 | -0- |
| Interest | 11,320 | 11,320 | -0- |
| Charitable Contributions | 2,300 | -0- | 2,300 |
| Error Correction | 40 | -0- | 40 |
| Total | $35,057 | $16,396 | $18,661 |

Respondent also audited 2618 Inc's Federal income tax returns for 1987 and 1988 and eventually issued no-change letters with regard thereto.

## Items of Income Conceded by the Parties

For 1987 and 1988, petitioner and respondent have made concessions and have entered into stipulations as to the treatment as taxable income to petitioner of portions of the total deposits made into petitioner's bank accounts and of checks made payable to petitioner but not deposited into his bank accounts (Other Checks), as set forth below. The amounts shown as conceded by petitioner are

to be treated as taxable income.  The amounts shown as conceded by respondent are to be treated as nontaxable income.

| Year | Total Deposits Into Petitioner's Bank Accounts | Deposits Conceded | | Other Checks Conceded | |
| --- | --- | --- | --- | --- | --- |
| | | By Petitioner | By Respondent | By Petitioner | By Respondent |
| 1987 | $533,388 | $234,453 | $253,477 | $20,311 | $19,249 |
| 1988 | 505,979 | 182,338 | 278,757 | -- | -- |

The above deposits and other checks conceded by petitioner as taxable income generally reflect funds petitioner received as legal and management fees from 2618 Inc and other funds that petitioner received in connection with his law practice.

Bank Deposits and Other Checks Still in Dispute

For 1987, the treatment as taxable income of $45,458 in bank deposits and $10,677 in checks made payable to petitioner but not deposited into petitioner's bank accounts remains disputed by the parties.

For 1988, the treatment as taxable income of $44,884 in bank deposits remains disputed by the parties.

With regard to the $45,458 in bank deposits still in dispute for 1987, the following schedule reflects for each bank account the date, payor, and amount of each bank deposit:

| Disputed Bank Deposits for 1987 | | |
|---|---|---|

Texas Commerce Bank Account No. 14909839

| Date | Payor | Disputed Amount |
|---|---|---|
| 06/03/87 | 2618 Inc | $  419 |
| 07/09/87 | 2618 Inc | 438 |
| 08/18/87 | TLD Overage-Payoff 1300563874 | 350 |
| 09/28/87 | Fireman's Fund Ins | 5,000 |
| 11/10/87 | Farmers Ins | 742 |

TexGuarantyBk Account No. 40033653

| Date | Payor | Disputed Amount |
|---|---|---|
| 04/28/87 | 2618 Inc | $ 2,461 |
| 05/27/87 | 2618 Inc | 2,461 |
| 06/29/87 | 2618 Inc | 2,461 |
| 07/28/87 | 2618 Inc | 2,461 |
| 08/26/87 | 2618 Inc | 2,461 |
| 09/16/87 | Preferred Risk Group/Heineke | 3,534 |
| 09/28/87 | 2618 Inc | 2,461 |
| 10/26/87 | Stewart Title Austin | 12,826 |
| 10/27/87 | 2618 Inc | 2,461 |
| 11/25/87 | 2618 Inc | 2,461 |
| 12/28/87 | 2618 Inc | 2,461 |
| | Total | $45,458 |

With regard to the $10,677 in checks not deposited into petitioner's bank accounts still in dispute for 1987, the following schedule reflects the date, payor, check number, and amount of each check.

| Disputed Checks Not Deposited into Petitioner's Bank Accounts for 1987 | | | |
|---|---|---|---|
| Date | Payor | Check No. | Disputed Amount |
| 01/19/87 | 2618 Inc | 3680 | $ 1,893 |
| 01/21/87 | 2618 Inc | 3687 | 1,169 |
| 02/23/87 | 2618 Inc | 3741 | 941 |
| 03/09/87 | 2618 Inc | 3853 | 233 |
| 04/01/87 | 2618 Inc | 3928 | 358 |
| 05/01/87 | 2618 Inc | 4031 | 436 |
| 08/03/87 | 2618 Inc | 4423 | 322 |
| 08/21/87 | 2618 Inc | 4510 | 1,000 |
| 09/08/87 | 2618 Inc | 4595 | 376 |
| 10/05/87 | 2618 Inc | 4714 | 255 |
| 11/02/87 | 2618 Inc | 4874 | 233 |
| 12/02/87 | 2618 Inc | 5040 | 217 |
| -- | David Eyre | -- | 2,000 |
| -- | Bank | -- | 36 |
| -- | Bank | -- | 108 |
| -- | Thomas Vandiver | -- | 1,100 |
| | | Total | $10,677 |

With regard to the $44,884 in bank deposits still in dispute for 1988, the following schedule reflects for each bank account the date, payor, and amount of each bank deposit.

### Disputed Bank Deposits for 1988

TexGuarantyBk Account No. 00007823

| Date | Payor | Disputed Amount |
|------|-------|-----------------|
| 03/30/88 | 2618 Inc | $ 2,461 |
| 04/26/88 | 2618 Inc | 2,461 |
| 05/13/88 | 2618 Inc | 46 |
| 05/31/88 | 2618 Inc | 2,461 |
| 06/20/88 | 2618 Inc | 2,500 |
| 06/29/88 | 2618 Inc | 2,461 |
| 08/01/88 | 2618 Inc | 2,461 |
| 08/22/88 | Providence Washington Insurance | 450 |
| 09/02/88 | 2618 Inc | 2,500 |
| 09/12/88 | 2618 Inc | 2,500 |
| 09/26/88 | 2618 Inc | 2,000 |
| 10/03/88 | 2618 Inc | 2,461 |
| 10/07/88 | 2618 Inc | 2,500 |
| 10/20/88 | 2618 Inc | 2,461 |
| 11/04/88 | 2618 Inc | 2,500 |
| 11/08/88 | 2618 Inc | 2,461 |
| 12/05/88 | 2618 Inc | 1,230 |
| 12/08/88 | 2618 Inc | 1,231 |
| 12/29/88 | Bank Statement-Missing Item | 2,461 |

TexGuarantyBk Account No. 4003653

| Date | Payor | Disputed Amount |
|------|-------|-----------------|
| 02/11/88 | 2618 Inc | $ 160 |
| 02/19/88 | 2618 Inc | 2,461 |
| 02/29/88 | 2618 Inc | 2,461 |
| 03/09/88 | 2618 Inc | 101 |
| 04/13/88 | 2618 Inc | 95 |
| | Total | $44,884 |

## Deductions Allowed by Respondent

For 1987 and 1988, respondent has conceded certain claimed business and itemized deductions in addition to the amounts previously allowed in the notices of deficiency. The total of the deductions claimed on petitioner's income tax returns that were

previously allowed by respondent combined with the claimed deductions now conceded is as follows:

| Total Deductions Allowed by Respondent | | |
|---|---|---|
| | 1987 | 1988 |
| Business Deductions: | | |
| Business Interest | $ 32,063 | $ 32,598 |
| Depreciation/Lakeway | 4,890 | 20,770 |
| Miscellaneous | 48,870 | 161,234 |
| Itemized Deductions: | | |
| Mortgage Interest | 15,965 | 27,397 |
| Taxes | 2,697 | 5,076 |
| Total | $104,485 | $247,075 |

## Deductions Still in Dispute

For 1987 and 1988, petitioner still disputes respondent's disallowance of the following business and itemized deductions claimed on petitioner's Federal income tax returns:

| Deductions Still in Dispute | | |
|---|---|---|
| | 1987 | 1988 |
| Business Deductions: | | |
| Business Interest | $117,074 | $37,024 |
| Bad Debt Deduction | 22,826 | -- |
| Miscellaneous | 27,135 | 21,318 |
| Itemized Deductions: | | |
| Medical | -- | 16,321 |
| Charitable Contrib. | -- | 2,300 |
| Total | $167,035 | $76,963 |

## Additional Deductions Claimed by Petitioner and Still in Dispute

For 1987 and 1988, petitioner on brief, and without properly raising such items, claims additional deductions, as follows:

## Additional Deductions Claimed by Petitioner

| Business Deductions: | 1987 | 1988 |
|---|---|---|
| Depreciation/Office Equip. | $ 77,393 | $ 58,045 |
| Bad Debt Deduction | -- | 127,174 |
| Payment to TABC | 15,700 | -- |
| NOL Carryforward from 1985 | 70,000 | -- |
| Itemized Deductions: | | |
| Medical | 15,442 | -- |
| Charitable Contributions | 2,300 | -- |
| Total | $180,835 | $185,219 |

OPINION

Unexplained Bank Deposits and Other Funds

On October 13, 1991, and October 26, 1992, respectively, the normal 3-year period of limitations for assessment expired with respect to petitioner's 1987 and 1988 Federal income tax liabilities. Accordingly, respondent's 1987 and 1988 notices of deficiency dated October 13, 1994, and September 26, 1995, respectively, are timely only if respondent establishes that petitioner's 1987 and 1988 Federal income tax returns were fraudulently filed or that there was omitted on those returns more than 25 percent of petitioner's correct gross income for each year. Sec. 6501(c), (e).

Generally, bank deposits represent prima facie evidence of income, and respondent need not prove a likely taxable source of such income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). However, where fraud is at issue, bank deposits will not be treated as taxable income unless respondent proves a likely taxable source of the bank

deposits or disproves nontaxable sources alleged by the taxpayer. Parks v. Commissioner, 94 T.C. 654, 661 (1990); see Armes v. Commissioner, 448 F.2d 972, 974-975 (5th Cir. 1971), affg. in part, revg. in part and remanding T.C. Memo. 1969-181.

Funds received by a taxpayer as a mere agent or conduit of a corporation are not treated as taxable income.  See Estate of Lashells v. Commissioner, 208 F.2d 430, 435 (6th Cir. 1953), affg. in part, revg. in part and remanding a Memorandum Opinion of this Court; Rehtorik v. Commissioner, T.C. Memo. 1996-532; Ishijima v. Commissioner, T.C. Memo. 1994-353.

Respondent has the burden to prove fraud by clear and convincing evidence and the burden to prove an omission of more than 25 percent of gross income by a preponderance of the evidence.  Sec. 7454(a); Rule 142(b); Peters v. Commissioner, 51 T.C. 226, 230 (1968).

On the basis of our findings of fact as to the source and the use of the funds that petitioner received during the years in issue, in the paragraphs below we first explain our conclusions as to the taxability to petitioner of each of the disputed bank deposits in the cumulative amount of $45,458 for 1987 (see supra p. 21) and of $44,884 for 1988 (see supra p. 22), and the $10,677 in disputed checks not deposited into petitioner's bank accounts for 1987 (see supra p. 21).  We then explain our conclusions as to the taxability to petitioner of cash withdrawals from the Club, the receipt of the stock of 2618 Inc, and petitioner's liability as guarantor of the $705,000 debt obligation to TexCommBk.

### Deposits and Other Checks Relating to
### the $55,753 TexAmBkSW Loan -- 1987 and 1988

Respondent argues that petitioner failed to pass through to TexAmBkSW and should be taxed on $4,228 in 1987 and $402 in 1988 that petitioner received from 2618 Inc in order to pay interest due on the $55,753 TexAmBkSW loan (see supra p. 7). Petitioner argues that he passed through the disputed funds to TexAmBkSW and should not be taxed thereon. For 1987 and 1988, evidence in the record indicates that petitioner paid $7,254 and $10,361, respectively, to TexAmBkSW (see supra pp. 14-15), and no evidence indicates that petitioner or 2618 Inc owed any separate debt obligation to TexAmBkSW other than the above $55,753 loan on which interest was due. We conclude that petitioner, on behalf of 2618 Inc, passed through the disputed $4,228 and $402 to TexAmBkSW as payments on the $55,753 loan and that these disputed funds should not be treated as taxable income to petitioner.

### Deposits Relating to the $275,000
### TexGuarantyBk Loan -- 1987 and 1988

Respondent argues that petitioner failed to pass through to TexGuarantyBk $22,149 in 1987 (see supra p. 8) and $29,532[1] in 1988 that petitioner received from 2618 Inc in order to pay interest due on the $275,000 TexGuarantyBk loan. Petitioner argues that he passed

---

[1] This $29,532 represents $12,251 that petitioner allegedly failed to pay as interest to TexGuarantyBk on the $275,000 loan, and the $17,281 that petitioner received from 2618 Inc and used for personal purposes (see supra pp. 7-8).

through the disputed funds to TexGuarantyBk and should not be taxed thereon.

With regard to 1987, evidence in the record indicates that petitioner in 1987 paid funds to TexGuarantyBk that exceeded the $22,149 that petitioner received from 2618 Inc to pay on the $275,000 TexGuarantyBk loan (see supra pp. 14-15). We conclude that the amount of $22,149 in dispute for 1987 was received by petitioner on behalf of 2618 Inc, was paid by petitioner to TexGuarantyBk, and should not be treated as taxable income to petitioner.

With regard to the disputed $29,532 in deposits for 1988, evidence indicates that petitioner in 1988 made total interest payments of $12,251 to TexGuarantyBk on the $275,000 loan (see supra p. 15). Other evidence indicates that petitioner did not pay to TexGuarantyBk all of the funds that he received from 2618 Inc to pay on this loan. We conclude that the amount of $17,281 or the difference between the total $29,532 that petitioner received in 1988 from 2618 Inc with regard to interest due on the $275,000 loan and the $12,251 in interest that petitioner paid to TexGuarantyBk should be treated as taxable income to petitioner.

### $12,826 in Deposits Relating to Payne & Potter -- 1987

Respondent argues that the $12,826 deposited into petitioner's bank accounts (see supra p. 19) in connection with the disposition of real estate held by Payne & Potter should be taxable to petitioner as

- 28 -

ordinary income.  Petitioner argues that the real estate that was held by Payne & Potter was sold at a loss.

No credible evidence in the record supports a finding that Payne & Potter or petitioner incurred a loss with respect to any real estate held by Payne & Potter, and we are satisfied that the real estate activities of Payne & Potter constituted the source of this $12,826.  We conclude that this $12,826 deposited into petitioner's bank accounts should be taxable to petitioner as ordinary income received in connection with petitioner's interest in Payne & Potter.

### $12,000 in Deposits Relating to Legal Fees -- 1988

Respondent argues that $12,000 in disputed deposits constituted legal fees paid to petitioner by 2618 Inc and not funds received by petitioner to make payments on the $55,753 TexAmBkSW loan transaction, as alleged by petitioner.[2]  Respondent notes that the $12,000 in deposits was received by petitioner after the maturity date of the $55,753 loan and that, on checks representing $9,500 of the disputed $12,000, the funds were described as legal fees.

Consistent with the credible evidence, we conclude that the $12,000 constituted taxable legal fees to petitioner.

---

[2]    This $12,000 in alleged legal fees represents the sum of the disputed bank deposits at TexGuarantyBk, account No. 00007823, that were dated 6/20/88, 9/2/88, 9/12/88, 9/26/88, and 10/7/88 (see supra p. 20).

Remaining Disputed Bank Deposits and
Other Checks -- 1987 and 1988

With regard to the remaining $16,932[3] disputed bank deposits and other checks for 1987 and the remaining $2,950[4] disputed bank deposits for 1988, we conclude that the deposits should be treated as taxable income to petitioner. Petitioner's law practice constitutes the likely taxable source of these deposits.

Cash Withdrawals From the Club -- 1987 and 1988

Respondent argues that the $6,721 and $4,699 that petitioner withdrew from the cash registers of the Club in 1987 and 1988 were used for personal purposes and constituted taxable income to petitioner. Petitioner argues that only $320 of the cash withdrawals (represented by receipts reflecting the handwritten notation "draw") should be taxable to him and that the remaining cash withdrawals were used to recruit dancers for the Club and should not be taxable to him.

---

[3] This $16,932 represents the sum of the following: The disputed bank deposits at TexCommBk, account No. 14909839, that were dated 8/18/87, 9/28/87, and 11/20/87; the disputed bank deposit at TexGuarantyBk, account No. 40033653, that was dated 9/16/87; and the disputed checks not deposited into petitioner's bank accounts that were dated 1/19/87, 1/21/87, and 8/21/87, plus four other undated checks made payable to petitioner totaling $3,244 (see supra pp. 19-20).

[4] This $2,950 represents the sum of the disputed bank deposits at TexGuarantyBk, account No. 00007823, that were dated 8/22/88 and 11/4/88 (see supra p. 20).

Petitioner's testimony on this issue was not credible and was contradicted by other employees of the Club. The above cash withdrawals from the Club in the amounts of $6,721 and $4,699 are to be treated as taxable income to petitioner.

## Valuation of 2618 Inc's Stock as of September 20, 1988

Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973). The valuation of property involves a question of fact. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

In the absence of arm's-length sales near the valuation date, closely held stock generally is to be valued on the basis of such factors as the corporation's net worth, prospective earning power, and dividend-paying capacity. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).

Petitioner does not appear to dispute the treatment of his receipt of the stock of 2618 Inc as taxable income. As indicated, petitioner's purported purchase of the stock was a sham. Petitioner received the outstanding stock of 2618 Inc in payment of legal fees owed to him in excess of $500,000, and the value of the stock petitioner received constitutes taxable income to petitioner.

Petitioner, however, argues that because of the ongoing litigation over issuance to 2618 Inc of the mixed beverage and SB permits, the stock of 2618 Inc had no value when he received the stock in 1988. Petitioner argues that the possibility was high that the Club would be required to close as a topless dance club and that that possibility eliminated any future income and goodwill value associated with the Club's operations and with the stock of 2618 Inc. Petitioner did not call an expert witness with regard to the value of the stock of 2618 Inc.

As explained, in the notice of deficiency for 1988, respondent determined that the stock of 2618 Inc had a value of $1.5 million when petitioner received it. At trial, respondent's expert used a discounted cash-flow analysis and arrived at alternative values for the stock of 2618 Inc. Assuming that the Club would receive an SB permit and continue operating indefinitely beyond the projected March 31, 1990, termination date, respondent's expert first valued the stock at $1,140,000. In the alternative, assuming that the Club would not receive an SB permit and would be required to close as of March 31, 1990, respondent's expert valued the stock of 2618 Inc at $230,000. Both of the valuations of respondent's expert assume that the Club would operate with mixed beverage permits.

The evidence establishes that on September 20, 1988, petitioner received all the outstanding stock of 2618 Inc, not in a legitimate purchase transaction, but in payment of the over $500,000 in legal fees owed to petitioner by 2618 Inc and by Helmle. In the months

proximate to the valuation date and in spite of litigation pending over the SB and mixed beverage permits, petitioner and others viewed 2618 Inc and the Club as constituting a profitable business enterprise. In correspondence and other documents, petitioner consistently represented the value of 2618 Inc at or exceeding $1 million. Offers from third parties apparently were received to purchase the Club or the stock of 2618 Inc at a price exceeding $1 million.

A report prepared by Helmle that petitioner used during hearings held in 1989 relating to the SB permit stated that 2618 Inc with an SB permit would have a value of $2 million and could earn net profits each year of over $1 million. Helmle also stated in the report that since 1980, the Club had average annual sales of alcoholic beverages of over $2 million.

Petitioner testified that, in his opinion, the Club in 1991 had a value of $1.1 million and that in 1997, at the time of trial of these cases, the Club had a value of $2.1 million.

As indicated, we have found that petitioner's acquisition of the stock of 2618 Inc did not become effective until September 20, 1988, with the Club's receipt of the mixed beverage permits from TABC. Thus, the dispute involving the mixed beverage permits was resolved simultaneously with petitioner's receipt of the stock, and we do not regard that dispute as having any significant effect on the value of the stock of 2618 Inc as of the date petitioner received the stock.

However, as of September 20, 1988, the date on which petitioner received the stock, we regard the continuing dispute and litigation involving the SB permit as having a significant effect on the value of the stock of 2618 Inc that petitioner received. Without the SB permit, the Club's continued operation as a viable business was not likely. Litigation involving the SB permit was not resolved until 1990 when the Club finally received the SB permit.

Respondent's expert's valuation of $1,140,000 does not take into account the unresolved dispute over the SB permit and the possibility the Club would be required to close on March 31, 1990. On the other hand, respondent's expert's alternative valuation of $230,000 does not adequately reflect the possibility that the SB permit dispute would be resolved favorably and that the Club would be able to operate indefinitely.

Respondent's expert acknowledges that in his opinion, risks associated with the SB permit litigation might well place the value of the stock of 2618 Inc between his $230,000 and $1,140,000 alternate valuation figures.

We conclude that respondent's expert's $1,140,000 valuation for the stock of 2618 Inc should be reduced by a discount of 50 percent to reflect risks associated with the litigation over the SB permit. We conclude that the proper value of the stock of 2618 Inc that petitioner received on September 20, 1988, was $570,000. This amount is further supported or corroborated by the approximate $500,000 in legal fees that were owed to petitioner and for which the stock was

transferred to petitioner and by the $500,000 face amount of the promissory note that nominally was associated with petitioner's receipt of the stock.

This $570,000 is the additional amount that petitioner is required to report as taxable income for 1988 with regard to his receipt of ownership of the stock of 2618 Inc.

Alleged Discharge of Indebtedness Income -- 1988

Generally, the difference between the face value of a debt and the amount paid in satisfaction of a debt is treated as taxable income to the debtor from discharge of the indebtedness.  Sec. 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931); Babin v. Commissioner, 23 F.3d 1032, 1034 (6th Cir. 1994), affg. T.C. Memo. 1992-673.  The inclusion in a taxpayer's income of an amount associated with discharge of a debt is based on the increase in the debtor's assets and net worth as a result of the discharge of the debt.  Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 F.2d 95, 96 (5th Cir. 1934), revg. 27 B.T.A. 651 (1933).

Respondent argues that petitioner did not in good faith contest the nature and amount of his liability as guarantor of Payne & Potter's $705,000 promissory note and that petitioner realized discharge of indebtedness income of $349,500 when that liability was settled.

Petitioner argues that his liability under the guaranty constituted a mere contingent liability, that he contested in good

faith the nature and amount of the liability, and that he should not be required to report discharge of indebtedness income in connection with settlement of this liability.

In Landreth v. Commissioner, 50 T.C. 803, 812-813 (1968), we distinguished the situation involving a guarantor of a debt from that of a primary obligor on a debt, and we concluded that a guarantor of a debt, upon the payment of the debt by the primary obligor, does not realize discharge of indebtedness income when relieved of an obligation under a guaranty.  We stated as follows:

> The situation of a guarantor is not like that of a debtor who as a result of the original loan obtains a nontaxable increase in assets.  * * * Where a debtor is relieved of his obligation to repay the loan, his net worth is increased over what it would have been if the original transaction had never occurred.  This real increase in wealth may be properly taxable.  However, where the guarantor is relieved of his contingent liability, either because of payment by the debtor to the creditor or because of a release given him by the creditor, no previously untaxed accretion in assets thereby results in an increase in net worth.  * * * [Id. at 813; citations omitted.]

On the evidence before us, we conclude that the discharge of the balance due on Payne & Potter's $705,000 debt obligation to TexCommBk may have resulted in discharge of indebtedness income to Payne & Potter but not to petitioner.  When petitioner's contested liability as guarantor of the debt obligation was settled, petitioner did not realize an increase in net worth, and petitioner is not to be charged with discharge of indebtedness income with regard thereto. See id.; Whitmer v. Commissioner, T.C. Memo. 1996-83.

## 2618 Inc's Subchapter S Election -- 1988

By amended answer, respondent argues that due to the $91,668 improper deduction claimed for legal fees on 2618 Inc's tax return for 1988 (which under our findings is to be treated as payments of principal on the $275,000 TexGuarantyBk loan), 2618 Inc's income for 1988 should be increased by $91,668, and petitioner should now be charged with $91,668 in additional flow-through income from 2618 Inc.

Petitioner counters that because Helmle did not sign the consent to elect S corporation status, 2618 Inc did not make a valid S corporation election for 1988, and petitioner should not be required to report as flow-through income the $91,668 increase to the income of 2618 Inc.  For the same reason, petitioner now seeks to remove from his reported taxable income for 1988 the $32,326 in S corporation flow-through income from 2618 Inc that was reported on his 1988 Federal income tax return.

Respondent argues that the attempted S election made on behalf of 2618 Inc on March 15, 1988, was valid because, during all of 1988, petitioner, not Helmle, was the sole person in control of 2618 Inc.

Section 1362(a) provides that small business corporations may elect to be governed by the provisions of subchapter S and thereunder to be taxed as flow-through entities.  Sec. 1362(a).  For such an election to be valid, all shareholders of the corporation, as of the date the election is made, are required to consent to the election.

Sec. 1362(a)(2); Wilson v. Commissioner, 560 F.2d 687, 689 (5th Cir. 1977), affg. T.C. Memo. 1975-92.

Also, if an S election is to be effective for the current year in which the election is made, section 1362(b)(2)(B) provides that each person who was a shareholder at any time during the year (before the time the election is made) is required to consent to the election. Sec. 1362(b)(2)(B); sec. 18.1362-2(b), Temporary Income Tax Regs., 48 Fed. Reg. 3591 (Jan. 26, 1983).

We note that during at least part of 1988, petitioner and TABC treated Helmle as an owner of the stock of 2618 Inc. Until September of 1988, TABC would not issue mixed beverage permits to the Club because of Helmle's continuing ownership interest in 2618 Inc, and Helmle certainly considered himself an owner of the stock of 2618 Inc. In 1988, petitioner actively sought a buyer for Helmle's interest in 2618 Inc.

On the evidence, Helmle is to be considered a beneficial owner of the stock of 2618 Inc during a part of 1988, and Helmle's consent therefore was necessary for the 2618 Inc's S election to be effective for 1988. See sec. 1362(b)(2)(B); Wilson v. Commissioner, supra; sec. 18.1362-2(b), Temporary Income Tax Regs., supra.

Respondent suggests that the duty of consistency prevents petitioner from now contradicting the treatment of 2618 Inc on petitioner's 1988 Federal income tax return as an S corporation. The duty of consistency is generally applicable to prevent a taxpayer from taking inconsistent positions in different taxable years when

one of the tax years is closed with regard to assessment. <u>Herrington</u> <u>v. Commissioner</u>, 854 F.2d 755, 757 (5th Cir. 1988), affg. 87 T.C. 1087 (1986). With regard to petitioner's 1988 tax year, respondent seeks to apply the doctrine where only one taxable year is involved, where respondent audited the 1988 income tax return of 2618 Inc and where respondent issued a no-change report. In this case, we decline to apply the duty of consistency to petitioner with regard to this adjustment.

The absence of Helmle's consent makes the attempted S election by 2618 Inc invalid for 1988, and petitioner is not required to report the additional $91,668 in flow-through income from 2618 Inc that represented nondeductible repayments on a loan.

Petitioner's attempt, however, on brief, to raise a new issue and to remove from his taxable income the $32,326 in flow-through income from 2618 Inc that petitioner did report on his 1988 Federal income tax return is rejected. Petitioner's claim in this regard constitutes a claim for refund with regard to an item not properly raised by petitioner as a new issue under our Rules. Rule 41.

Deductions Still in Dispute and Additional
Deductions Claimed by Petitioner

As indicated above (see supra p. 21), petitioner still disputes respondent's disallowance of $167,035 and $76,963 in business and itemized deductions claimed on petitioner's respective 1987 and 1988 Federal income tax returns. Petitioner also seeks to claim herein additional business and itemized deductions of $110,835 and $185,219 for 1987 and 1988 (see supra p. 22), respectively. Based on our findings of fact, our conclusions as to the above claimed deductions are set forth below.

Claimed Business Interest Deductions -- 1987 and 1988

Petitioner argues that the entire $117,074 for 1987 and $37,024 for 1988 in claimed business interest (see supra p. 21) is deductible as such. For 1987, the $117,074 claimed business interest consists of $76,361 paid on petitioner's guaranty to TexCommBk and $40,713 paid to other banks. For 1988, the $37,024 in disputed business interest consists of $19,139 paid on petitioner's guaranty to TexCommBk and $17,885 paid to other banks. Alternatively, with respect to the $76,361 for 1987 and the $19,139 for 1988 that were paid to TexCommBk, petitioner argues that he is entitled to a business bad debt deduction.

The evidence is incomplete and confusing with regard to many of the payments petitioner made to various banks. In attempting to substantiate the claimed business interest deduction, petitioner merely identified checks to various banks that in total approximated

the amount of business interest reported on his income tax returns. The evidence does not identify the portion of the payments that constitutes interest as distinguished from principal.

The $76,361 and $19,139 that petitioner paid to TexCommBk as guarantor does not give rise to the payment of interest by petitioner.  Rather, such payments by petitioner as guarantor of Payne & Potter's debt obligation to TexCommBk are to be treated in their entirety as the payment by petitioner of his obligation under the guaranty, and they give rise to a debt obligation of Payne & Potter in favor of petitioner.  In effect, petitioner is to be treated as having made a loan to Payne & Potter.  See Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Southern Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 565-566 (1980).

Petitioner's guaranty of Payne & Potter's debt obligation was not made in the course of petitioner's trade or business.  Petitioner practiced law as an attorney.  He did not engage in real estate development outside of his involvement as a 50-percent owner of the stock of Payne & Potter.  Petitioner's investment in and his guaranty of the $705,000 debt obligation of Payne & Potter constituted investment, not ordinary business, activity.  Accordingly, due to Payne & Potter's insolvency, petitioner is entitled only to a nonbusiness bad debt deduction for the $76,361 and the $19,139 paid to TexCommBk in 1987 and 1988, respectively, on his guaranty, deductible as short-term capital losses.  Sec. 1.166-9(b), Income Tax Regs.

With regard to the $40,713 and $17,885 balance for 1987 and 1988, respectively, of the claimed business interest in dispute, no credible evidence supports the treatment of these amounts as payments of interest, and we disallow the claimed deductions for these amounts.

### Claimed $22,826 Business Bad Debt Deduction -- 1987

Petitioner argues that he is entitled to a $22,826 business bad debt deduction (see supra p. 21) relating to an alleged $150,000 loan made by him to Payne & Potter apart from his guaranty on the $705,000 debt obligation to TexCommBk. The evidence does not support the existence of any separate loan of $150,000 made by petitioner to Payne & Potter. Petitioner's testimony on this item was not credible. Petitioner's claimed deduction for a $22,826 business bad debt was properly disallowed.

### Remaining Claimed Business Deductions -- 1987 and 1988

No evidence supports the remaining $27,135 and $21,318 in business deductions that petitioner claims for 1987 and 1988, respectively (see supra p. 21). These deductions were properly disallowed by respondent.

### Itemized Deductions Still in Dispute -- 1988

Petitioner argues that he is entitled to the claimed itemized deductions for medical expenses of $16,321 and charitable contributions of $2,300 (see supra p. 21).

No evidence supports these claimed deductions, and they are disallowed.

### Additional Deductions Claimed on Brief -- 1987 & 1988

On posttrial brief only, petitioner claims additional business and itemized expenses for 1987 and 1988 of $110,835 and $185,219, respectively (see supra p. 22). These claimed additional expenses relate to completely unsubstantiated alleged depreciation, bad debts, payments to TABC, a net operating loss, medical expenses, and charitable contributions. These claimed deductions were not properly raised by petitioner in his petition or by motion. Rule 41. No credible evidence supports these claimed deductions, and they are disallowed.

We also note that for fraud purposes, a taxpayer is generally required to present probative evidence of deductions not previously claimed on his income tax return before respondent bears any burden of proof with regard to alleged additional deductions. See United States v. Bender, 218 F.2d 869 (7th Cir. 1955); Rivera v. Commissioner, T.C. Memo. 1979-343.

### Fraud for 1987 and 1988

To establish fraud, respondent has the burden of proving by clear and convincing evidence that a taxpayer underpaid his Federal income taxes and that the taxpayer's underpayment was due to fraudulent intent. Sec. 7454(a); Rule 142(b); Clayton v.

Commissioner, 102 T.C. 632, 646 (1994); Recklitis v. Commissioner, 91 T.C. 874, 909 (1988).

With regard to fraudulent intent, respondent is required to prove that a taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Zell v. Commissioner, 763 F.2d 1139 (10th Cir. 1985), affg. T.C. Memo. 1984-152; Parks v. Commissioner, 94 T.C. at 661; Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). Because direct evidence of fraud is not generally available, fraud often must be established by circumstantial evidence. Clayton v. Commissioner, supra at 647; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

Courts have developed certain indicia of fraud, including the following: (1) Understatements of income; (2) inadequate books and records; (3) failure to file income tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealed assets; (6) failure to cooperate with tax authorities; (7) dealing in cash; and (8) filing false documents. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. The level of sophistication and intelligence of taxpayers may also be considered. See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

For the years before us, where respondent proves that any part of a taxpayer's underpayment of income tax is due to fraud, fraud is presumed with respect to the entire underpayment unless a taxpayer

proves otherwise by a preponderance of the evidence. Sec. 6653(b)(2).

### Corrected Income and Deductions for 1987 and 1988

The following schedules reflect for 1987 and 1988 our findings and conclusions as to petitioner's correct total income and deductions including income previously reported by petitioner and deductions previously allowed by respondent:

#### Items of Income for 1987

| Description | Amount |
|---|---|
| Conceded Bank Deposits | $234,453 |
| Conceded Checks Made Payable to Petitioner | 20,311 |
| Bank Deposits Relating to Payne & Potter | 12,826 |
| Miscellaneous Bank Deposits and Other Checks | 16,932 |
| Cash Withdrawals from the Club | 6,721 |
| Total | $291,243 |

#### Deductions Allowed for 1987

| Description | Amount |
|---|---|
| Allowed Business Deductions: | |
|     Business Interest | $32,063 |
|     Depreciation/Lakeway | 4,890 |
|     Miscellaneous | 48,870 |
| Allowed Itemized Deductions: | |
|     Mortgage Interest | 15,965 |
|     Taxes | 2,697 |
| Nonbusiness Bad Debt Relating to Guaranty | 3,000 |
| Total | $107,485 |

Items of Income for 1988

| Description | Amount |
|---|---|
| Conceded Bank Deposits | $182,338 |
| Funds Relating to $275,000 TexGuarantyBk Loan | 17,281 |
| Bank Deposits Relating to Legal fees | 12,000 |
| Miscellaneous Bank Deposits | 2,950 |
| Cash Withdrawals from the Club | 4,699 |
| Reported Flow-through Income | 32,526 |
| Reported Value of Assets of 2618 Inc | 35,000 |
| Value of Stock of 2618 Inc | 570,000 |
| Total | $856,794 |

Deductions Allowed for 1988

| Description | Amount |
|---|---|
| Allowed Business Deductions: | |
|     Business Interest | $ 32,598 |
|     Depreciation/Lakeway | 20,770 |
|     Miscellaneous | 161,234 |
| Allowed Itemized Deductions: | |
|     Mortgage Interest | 27,397 |
|     Taxes | 5,076 |
| Nonbusiness Bad Debt Relating to Guaranty | 3,000 |
| Total | $250,075 |

Based on the above figures, the schedule below compares the total income, deductions, and losses reported on petitioner's Federal income tax returns for 1987 and 1988 with the corrected amounts therefor based on our findings and reflects large understatements of taxable income and large underpayments of tax on petitioner's 1987 and 1988 Federal income tax returns as filed:

| | 1987 | | 1988 | |
|---|---|---|---|---|
| | Reported | Corrected | Reported | Corrected |
| Total Income | $241,692 | $291,243 | $224,303 | $856,794 |
| Deductions | 247,968 | 107,485 | 232,646 | 250,075 |
| Income (Loss) | $ (6,276) | $183,758 | $ (8,343) | $606,719 |

We are satisfied that respondent has shown the existence of underpayments for both years by clear and convincing evidence. Accordingly, the first element of the fraud addition to tax is established for both 1987 and 1988.

### Fraudulent Intent for 1987 and 1988

Petitioner argues that he should be regarded as an unsophisticated taxpayer, that he handled his tax matters in an inattentive manner, and that because of large deductions he assumed were available to him he innocently estimated he owed no Federal income taxes for 1987 and 1988. Petitioner further argues that he filed his Federal income tax returns without much thought and that any underreporting of his correct income that was reflected on his tax returns was inadvertent.

For 1987 and 1988, petitioner substantially underreported his correct income, and for 1987, petitioner overstated his allowable deductions.

Petitioner failed to maintain adequate books and records for his law firm, and he failed to provide that adequate books and records be maintained for 2618 Inc, for the Club, and for Payne & Potter. Petitioner's inadequate records and his inconsistent and ever-changing explanations complicated greatly respondent's audit and resolution of the issues in these cases. Petitioner failed to cooperate with respondent during respondent's audit and during parts of these proceedings.

Petitioner submitted to banks and other businesses and governmental entities false copies of his income tax returns and false financial and other information.

For 1988, petitioner reported gross receipts of $189,788, disregarding a Form 1099 from 2618 Inc reflecting nonemployee compensation to petitioner of $281,176.

We are not persuaded by petitioner's arguments that he innocently and inattentively bungled his tax affairs.  In light of the evidence, we view petitioner's assertions of ignorance and unsophistication as simply another attempt by petitioner to obscure the facts.

For 1987 and 1988, we conclude that the increases to petitioner's taxable income that we have sustained herein (relating to bank deposits, disputed checks not deposited into petitioner's bank accounts, cash withdrawals from the Club, and deductions that we have not allowed) are attributable to fraud.

For 1988, we note that the increase to petitioner's taxable income relating to petitioner's receipt of the stock of 2618 Inc is also attributable to fraud.  We view petitioner's failure to report any amount as income in connection with his receipt of the stock as part of petitioner's fraudulent conduct.  We recognize the difficulties in valuing the stock.  Our valuation, however, is supported by petitioner's representations as to the value of 2618 Inc and by the outstanding legal fees in excess of $500,000 for which the

stock was received.  Also, petitioner's receipt of the stock in payment for legal services was disguised as a purchase and sale.

Respondent has established by clear and convincing evidence that petitioner fraudulently underreported and underpaid his Federal income taxes for 1987 and 1988.  We conclude that the fraud addition to tax applies to the entire underpayment for each year.  Sec. 6653(b)(2).

Because petitioner fraudulently filed his 1987 and 1988 Federal income tax returns, the period of limitations does not bar assessment of income tax for those years.  Sec. 6501(c)(1).

Petitioner makes no separate argument for 1987 and 1988 regarding the substantial understatement addition to tax.  In light of our findings and conclusions herein regarding petitioner's failure to report his correct income for 1987 and 1988, we sustain respondent's determination of the substantial understatement addition.

To reflect the foregoing,

Decisions will be entered
under Rule 155.