**UNITED COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 00-20107

_____


JERRY S. PAYNE; et al.,

                        Plaintiffs,

JERRY S. PAYNE,

                        Plaintiff - Appellee-Cross-Appellant,


v.


UNITED STATES OF AMERICA; et al.,

                        Defendants,

UNITED STATES OF AMERICA,

                        Defendant-Appellant-Cross-Appellee.


_____

Appeals from the United States District Court
for the Southern District of Texas

_____

May 7, 2002

Before POLITZ and EMILIO M. GARZA, Circuit Judges, and KAZEN, District Judge.*

KAZEN, Chief District Judge:

The United States appeals the verdict of the district court following a bench trial in which the court found the United States liable for a violation of I.R.C. § 7431. The district court's findings of fact and conclusions of law are set forth at 91 F.Supp. 2d 1014 (S.D.Tex 1999). In sum, the trial court determined that IRS Special Agent David Batista made unlawful disclosures of taxpayer Jerry S. Payne's confidential return information in violation of I.R.C. § 6103, and that these violations were not the result of a "good faith, but erroneous" interpretation of law. I.R.C. § 7431(b). The court awarded Payne $1,536,680 in actual damages, $1,000 in punitive damages, and $105,361 in attorneys fees and costs. For reasons hereinafter discussed, we REMAND for further findings.

I. Factual Background

In the fall of 1989, the Internal Revenue Service began a civil audit of 2618, Inc., a Texas corporation that operated a topless dance club under the name Caligula XXI. Jerry Payne, an attorney, became the owner of 2618, Inc. in 1988 as compensation for legal services for the then-owner, Gerhard Helmle. The IRS agent conducting the audit, Colin Levy, suspected fraud and referred the case to the IRS Criminal Investigation Division. The investigation of Payne was assigned to Special Agent Batista.

In October 1991, Batista and Levy arrived unannounced at Payne's law offices to inform Payne of the initiation of the investigation. At that time, Batista produced a summons for business and financial records associated with 2618, Inc. In response, Payne declared his willingness to cooperate fully and to provide the requested information in a timely manner. Batista was satisfied with the sincerity of Payne's stated intent to cooperate.

In December 1991, Batista began to contact third-parties seeking information regarding payments to Payne. For example, on December 19, 1991, Batista contacted the Texas Lawyers Insurance Exchange to inquire about a $36.00 payment it had made to Payne. Batista conceded

_____
*Honorable George P. Kazen, Chief United States District Judge for the Southern District of Texas, sitting by designation                1

that he could have obtained this information from Payne and that doing so would not have prejudiced his investigation. At trial, Batista admitted to making other third-party contacts as early as December 1991, and that he began to inquire into allegations of Payne's involvement with illegal drugs. Although Payne voiced concern over these contacts, he and Batista agreed on January 16, 1992 to a timetable for the voluntary production of 2168, Inc.'s records. A week later, Batista and Levy came to Payne's office to review and microfilm documents. Batista testified that, as of this date, he was happy with Payne's performance, cooperation, and his efforts to produce needed information.

From October of 1991 to July of 1992, Payne sent numerous letters to Batista requesting him to clarify the issues under investigation. The gist of these letters was that Payne wanted to know the scope of the inquiry so that he could provide Batista with relevant information in a manner that would preserve the confidentiality of the investigation. In his correspondence, Payne repeatedly conditioned his continued cooperation on Batista's agreeing to more specifically define the scope of his inquiry. Batista never responded to Payne's requests for a listing of specific areas of concern. On March 2, 1992, Batista and his supervisor Swayzine Fields met with Payne at Payne's office. During this meeting, Batista requested any work papers for Payne's 1987 and 1988 personal tax returns. Payne agreed to provide them. This was the first and only documented request for information relating to Payne's personal tax returns, although Batista testified that he made a previous oral request for the papers. Payne later informed Batista that he did not have any work papers for those returns.

By March of 1992, Batista apparently decided that Payne did not sincerely intend to cooperate with the investigation. At trial, Batista initially could not recall any specific incident that led him to this conclusion, but he eventually testified that the tone of Payne's letters gave him the sense that Payne would not fully disclose information without the imposition of untenable conditions. The district court concluded that Batista "had no rational explanation" for this conclusion. *Payne*, 91 F.Supp at 1029. In any event, Batista accelerated the pace of his investigation during and after March 1992. In that month, Batista sent out ten summonses to various corporations and banks seeking bank statements, canceled checks, deposit slips and deposited items, loan applications/agreements and related records. During and after that month,

Batista interviewed employees and officers of 2618, Inc. in person, introducing himself as a criminal investigator with the IRS who was investigating Payne's possible violation of criminal revenue laws. Batista asked some of the employees and some of Payne's relatives if they knew whether Payne used or sold illegal drugs. Batista contacted Payne's clients and former clients mostly by mail, issuing summonses for copies of any retainer agreements, expense reimbursement statements, or cancelled checks of payment. Batista also spoke with some of these clients over the telephone and interviewed some in person. During the course of the investigation, Batista issued a large number of summonses and letters to third-parties that disclosed on their face that Payne was under criminal investigation, and he revealed that fact during his in-person interviews.

In March of 1993, Batista terminated his investigation of Payne and recommended the case to the Justice Department for criminal prosecution. For the first time, an attorney for the Justice Department informed Payne of particular issues of concern, and in response Payne provided information that led the United States to conclude that criminal prosecution was not warranted for all the matters recommended by Batista. In 1995 Payne was indicted on two counts of violating I.R.C. § 7206 relating to tax fraud and three counts of violating I.R.C. § 7203 relating to failure to file tax returns. The trial court dismissed the § 7206 charges, and a jury acquitted Payne of the § 7203 charges.

Following the criminal trial, the IRS completed its civil examination and issued Payne a notice of deficiency for 1987 and 1988 individual income taxes and civil fraud penalties. The United States Tax Court entered a decision determining Payne's individual income tax for those years, and sustaining the fraud penalties. *Payne v. Commissioner*, 75 T.C.M. (CCH) 2548, 2565 (1998). This court reversed. *Payne v. Comm'r of Internal Revenue*, 224 F.3d 415, 424 (5th Cir. 2000). The panel found that the tax court erred in ruling that the United States had proven fraud by "clear and convincing" evidence and thus erroneously relied on the statutory fraud exception to prevail over the applicable statute of limitations. *Id*.

Payne then filed this suit in the district court, seeking damages from the United States and several IRS agents for their actions in conducting the investigation. The district court dismissed all defendants other than the United States, and all claims other than the wrongful disclosure of tax information claim. This claim was tried to the court, and at the conclusion of the trial, the

3

court held as follows: (1) Batista made a large number of third-party contacts in the course of his investigation of Payne without first determining whether the information sought was otherwise reasonably available; (2) Batista did not consider himself under any obligation to seek necessary information from Payne; (3) Batista disclosed numerous items of return information to these third parties, including the fact that Payne was subject to a criminal investigation; (4) there was no evidence that any of the disclosures of return information were necessary to obtain the information Batista sought; (5) Batista's disclosures did not result from a good faith but erroneous interpretation of the applicable statutory provision; (6) Batista's improper disclosures damaged Payne's law practice; (7) Batista grossly abused his discretion in making the numerous third-party contacts without first affording Payne the opportunity to provide the needed information, and in particular by inquiring about Payne's involvement with illegal drugs; and (8) the United States' litigation position was unreasonable given that Batista made no determination as to whether the information he sought was otherwise reasonably available.

## II.  Standard of Review

We review the district court's findings of fact for clear error and conclusions of law de novo. *Dunbar Medical Systems, Inc. v. Gammex Inc*.,  216 F.3d 441, 448 (5th Cir. 2000). Similarly, as to mixed questions of law and fact, we review the district court's fact findings for clear error, and its legal conclusions and application of law to fact *de novo*.  *Sugar Busters, LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999).   In reviewing factual findings for clear error, we defer to the findings of the district court unless we are left with a definite and firm conviction that a mistake has been committed.  *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Dunbar Medical Systems*, 216 F.3d at 453.

## III.  Statutory Framework

I.R.C. § 7431(a) creates a right of action against the United States if a federal employee or official knowingly or negligently violates the confidentiality provisions of § 6103.  Section 6103 states in relevant part:

4

> Returns and return information shall be confidential, and except as authorized by [the Internal Revenue Code], no officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise under the provisions of this section.

I.R.C. § 6103(a). "Return information" is defined broadly, to include in relevant part, "a taxpayer's identity . . . [and] whether the taxpayer's return was, is being, or will be examined or subject to investigation . . . ." I.R.C. § 6103(b)(2)(A). The United States concedes that Batista disclosed "return information." The United States does not incur liability for a violation of § 6103, however, if the violation "results from a good faith, but erroneous, interpretation of section 6103." I.R.C. § 7431(b). In the case of a finding of liability, I.R.C. § 7431(c) provides for the award of statutory or actual damages, punitive damages, and attorneys fees.

I.R.C. § 6103(k)(6) creates a safe harbor for IRS agents carrying out certain investigative duties, and allows for disclosures as follows:

> An internal revenue officer or employee may, in connection with his official duties relating to any . . . criminal tax investigation . . . disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title. Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation.

The Secretary has promulgated regulations pursuant to its authority. *See* 26 C.F.R. § 301.6103(k)(6)-1(a)&(b).

As § 6103(k)(6) has been construed by case law, an IRS agent may disclose return information during an investigation in order to obtain information, provided three requirements are met: (1) the information sought is "with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of the [Internal Revenue Code]." (2) the information sought is "not otherwise reasonably available"; and (3) it is "necessary to make disclosures of return information in order to obtain the additional information sought." *DiAndre v. United States*, 968 F.2d 1049, 1052 (10th Cir. 1992); *see also Barrett v. United States*, 795 F.2d 446, 449 (5th Cir.1986)(*"Barrett I"*).

IV. Points of Error

5

The United States raises five points of error.  It argues that:

1.  The district court erred as a matter of law by concluding that Batista was obliged to consider Payne as a source from whom necessary information might be "otherwise reasonably available." According to the United States, the taxpayer under investigation is an inherently unreliable source of information, and thus is never a "reasonably available" source of information.

2.  Even if the taxpayer might be a source from whom information is "otherwise reasonably available," the district court erred in finding that Payne was such a source here**.**  Further, the district court erred in finding that the disclosures were not necessary to obtain the information sought.

3.  If Batista did violate § 6103, the district court erred in finding that Batista's violation was not the result of a "good faith, but erroneous, interpretation" of that section.

4.  The district court erred in awarding punitive damages.

5.  The district court erred in awarding and calculating attorneys fees.

Payne cross-appeals the district court's damage award, contending that he had provided sufficient evidence to sustain an award of $3.3 million in actual damages and $9.9 million in punitive damages.


V.  The Taxpayer as "Reasonably Available" Source of Necessary Information

The United States argues that IRS special agents need never consider the taxpayer under investigation as a source from whom information is "reasonably available."  Reviewing the statute and regulations promulgated under its authority, as well as the court decisions construing § 6103(k)(6), we find no convincing authority for this rigid proposition.

According to the regulations, disclosures are authorized only when the necessary information cannot be reasonably obtained in "accurate and sufficiently probative form" or in a "timely manner," and "without impairing the proper performance of . . . official duties." 26 C.F.R. § 301.6103(k)(6)-1(a)&(b). Whether a disclosure is authorized depends upon the "facts and circumstances of the particular case." *Id.*  Rather than foreclosing the possibility that the taxpayer could ever be a source from whom necessary information may "reasonably be obtained," the regulations reflect the fact-intensive nature of the inquiry.

6

While we find no previous case that addresses the precise argument made by the United States here, this court's decision in *Barrett I* implicitly considers the taxpayer a "reasonably available" source of necessary information. There, the court reversed a summary judgment in favor of the IRS, finding a fact issue as to whether certain third-party contacts were necessary. Noting evidence that the IRS had "free access" to the taxpayer's bank records, the court concluded that "some disclosures, perhaps all, might have been avoided by reviewing and analyzing [those] bank records." *Barrett I*, 795 F.2d. at 450.

In *Kemlon Products & Development Co. v. United States*, 638 F.2d 1315 (5th Cir.1981), *modified on pet. for rehearing*, 646 F.2d 223 (5th Cir. 1981), this court reversed the granting of a permanent injunction prohibiting the IRS from disclosing the taxpayer's return information to its customers. The injunction was held to have violated the Anti-Injunction Act, 26 U.S.C. § 7421(a) (1999), because the taxpayer had not proved irreparable harm from the contacts. *Id.* at 1322. The court then suggested that even if irreparable harm had been established, in "all likelihood" the United States could defend a lawsuit on the basis of § 6103(k)(6). The underlying issue involved the value of certain patents, and the court noted the affidavit of the investigating agent that direct contact with the taxpayer's customers would be necessary to ensure candid responses. *Id.* at 1325. The tenor of this dicta indicated that the panel was evaluating the facts in that particular case and not endorsing an inflexible rule.[1]

The United States argues that it has the duty to corroborate a taxpayer's admissions and to investigate all reasonable leads to eliminate non-taxable deposits. *See Daniel Smith v. United States*, 348 U.S. 147, 154, 75 S.Ct. 194, 198, 99 L.Ed.192 (1954); *United States v. Hiett*, 581 F.2d 1199, 1201-1202 (5th Cir.1978); *United States v. Boulet*, 577 F.2d 1165, 1168 (5th

---

[1]     In recent litigation, the United States has implicitly adopted the position that the subject of the investigation might be a reasonable source of information. *See Nowicki v. Comm'r of Internal Revenue,* 262 F.3d 1162 (11th Cir.2001). There, the United States argued that the third-party contact was authorized by § 6103(k)(6) because "information regarding the nature of the expenses . . . was 'not otherwise reasonably available' because [the taxpayer] *disclaimed any knowledge of the nature of the expenses . . . .*" *Id*. at 1163 (emphasis added). Such an argument connotes that the taxpayer is not inevitably an inherently unreliable source for obtaining necessary information.

Cir.1978). Both of these tasks, the United States asserts, may only be accomplished through third-party contacts. To the extent that necessary evidence, corroborating or otherwise, is not reasonably available from sources provided by the taxpayer, § 6103(k)(6) obviously authorizes third-party contacts. However, even corroborating evidence might be available from bank or other records to which a taxpayer voluntarily grants access, thus negating the necessity of contacting third-parties. At any rate, in this case Batista was not merely corroborating information previously provided by Payne. Further, we find no contradiction between the need to eliminate nontaxable sources of income while still considering the taxpayer an "available source" of information, because "[i]n the typical case, the taxpayer gives the IRS 'leads' to possible nontaxable sources." *Hiett*, 581 F.2d at 1201; *see also Boulet*, 577 F.2d at 1169.

We do not hold that the taxpayer is always such a fruitful and reliable source of information that IRS agents may never approach third-parties for necessary information. We hold only that such a determination must be made in light of the "facts and circumstances of the case," and that the taxpayer's cooperation legitimately forms part of the inquiry.


## VI.  Necessity for Third-Party Contacts

The United States attacks the district court finding that, on the facts and circumstances of this case, Payne was a "reasonably available" source of information and that the disclosures were unnecessary in order to obtain the information sought. The district court found that Payne's efforts to cooperate were sincere and made in good faith, and that Batista in contrast made little or no effort to use this cooperation to advance his investigation. The court then made a blanket finding of no evidence that *any* disclosure of Payne's return information was necessary. We must evaluate this finding, however, only to the extent that it led to any damages to Payne. In *Barrett v. United States*, 100 F.3d 35 (5th Cir. 1996)(*"Barrett III"*), this court explained that the type of damages which must be proved by the taxpayer depends on the nature of the violation by the IRS. Thus, if the violation is simply an unnecessary third-party contact, an attorney-taxpayer such as Payne would have to prove that he lost business because of his clients' concerns over privacy issues. On the other hand, a violation occasioned by disclosure of the criminal nature of the investigation requires proof that Payne lost business because his clients thought him to be a "tax

cheat." *Id.* at 39. It is clear from the district court opinion and the record that Payne's proof of damages was of the latter type. Accordingly, we focus on the finding that Batista regularly revealed the *criminal nature* of his investigation of Payne when making third-party contacts, since Payne's damages can only be sustained on the basis of these disclosures.

This court has previously held that it was unnecessary for an IRS agent to disclose the criminal nature of an investigation when sending circular letters to the public requesting information regarding the taxpayer. *See Barrett v. United States*, 51 F.3d 475, 479 (1995)(*"Barrett II"*). Applying this standard, the district court here found that Batista's disclosure of the criminal nature of his investigation was not necessary to obtain the information sought. The district court specifically found that "Batista issued a large number of administrative summonses and letters to third-parties which disclosed on their face that Payne was under criminal investigation." 91 F.Supp. 2d at 1025. While the partial dissent considers this finding to be clearly erroneous, it is not directly challenged by the United States in this appeal. Instead, the United States argues that "the circular letter cases do not apply to live, face-to-face interviews." As discussed *infra*, ultimate resolution of this issue will require further factual findings.


VII.  Good Faith Erroneous Interpretation of Law

The United States argues that even if Batista made unauthorized disclosures, he did so pursuant to a good faith, but erroneous, interpretation of § 6103. In connection with a § 7134 violation, this circuit evaluates "good faith" under an objective standard. *See Huckaby v. United States Dept. of Treasury, I.R.S.*, 794 F.2d 1041, 1048 (5th Cir. 1986); *Barrett II* 51 F.3d at 479. "A reasonable IRS agent can be expected to know statutory provisions governing disclosure, as interpreted and reflected in IRS regulations and manuals. An agent's contrary interpretation is not in good faith." *Id.* Applying this test, the district court found that "a reasonable IRS agent would not have violated the express provisions contained in Sections 6103 and 7431 and in the IRS manuals and regulations." *Payne*, 91 F.Supp. at 1026. The district court further explained that "Batista initially claimed that although he was familiar with the statutes and the IRS regulations he was not required to try and obtain the needed information from the taxpayer first before with third-parties. Batista eventually admitted that he had violated express provisions

9

regarding disclosure." *Id.* Accordingly, the court found that Batista's disclosures were not made in good faith.

Following the district court's decision, we had occasion to examine the application of the *Huckaby* standard. In *Gandy v. United States*, 234 F.3d 281 (5th Cir. 2000), we held that two IRS agents who had disclosed return information (the taxpayer's identity and the fact of criminal investigation) to customers of a nursery had acted in good faith. The disclosures at issue were oral, made to customers the agents interviewed following distribution of a circular letter. We noted that Section 347.2 of the IRS Handbook, at least prior to 1992 changes, regulated the format and content of circular letters but did not apply "across the board to all disclosures, including oral disclosures." *Id.* at 286. We then noted Treasury Regulations allowing an IRS agent to disclose the nature of his official duties when investigating a taxpayer, as well as a Handbook provision authorizing display of credentials and badges identifying Criminal Investigation Division agents. We thus concluded that the IRS agents had a good faith belief that they could disclose the criminal nature of their investigation. *Id.* at 286-87.

The district court did not have the benefit of *Gandy* when it concluded that Batista did not have a good faith belief that he could disclose the fact of a criminal investigation. Also, as noted in *Gandy*, the section of the Handbook pertinent to that decision was amended in 1992. Furthermore, the district court's finding of bad faith appears to be based on the premise that all third-party contacts by Batista were not authorized. However, as we previously indicated, Payne's evidence of damages was based primarily on the disclosures of the criminal nature of the investigation. The number of third-parties contacted and disclosures made in this case is voluminous. Batista discussed the investigation with third-parties via in-person interviews, telephone calls, letters, and summonses. The holding that Batista lacked good faith is not tied to particularized findings as to precisely what information about a criminal investigation was disclosed to which parties and under which circumstances. Determining which of these disclosures were necessary and reconciliation with *Gandy* will therefore entail further factfinding by the district court.[2]

---

[2]We have no quarrel with the proposition that the good-faith analysis under § 7431 should follow the approach described in *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d

VIII.  Conclusion

This case is remanded for proceedings not inconsistent with this opinion.  Payne's cross-appeal for increased actual and punitive damages is dismissed as premature.

REVERSED AND REMANDED

<span style="color:red">ENDRECORD</span>

---

277 (1991) for civil rights cases.  That is, the district court should determine whether an error has actually been committed before considering whether the agent acted in good faith.  Since we are asking the district court to make more specific fact findings in this case, we think this issue can be clarified at that time.

EMILIO M. GARZA, Circuit Judge, specially concurring in part and dissenting in part:

I concur generally in parts I - V and VII - VIII of the majority's opinion, but respectfully dissent from part VI. I would hold (a) that Payne was not a reasonably available source for at least some of the information sought by the IRS in this case, and (b) that it is always "necessary" for IRS Special Agents to identify themselves as members of the Criminal Investigative Division when conducting in-person third-party interviews.

## I

I agree with the majority that the taxpayer under investigation might sometimes be an "otherwise reasonably available" source for at least some information sought by the IRS. The taxpayer might be able to provide exculpatory documents with independent indicia of reliability, such as bank records, cancelled checks, notarized copies of contracts, deeds, or credit card receipts that can help show that he has not committed a crime. These documents might alleviate the need for the IRS to contact at least some third parties in determining that a taxpayer has not cheated on his taxes.[3]

But I do not agree that Payne was a reasonably available source of information for all of the information sought by the IRS here. The majority overlooks this issue: it devotes much attention to the general question of whether taxpayers can ever be reasonably available sources of information, but little to the facts of this case. The majority's only analysis of this issue consists in a citation to a supposed factual finding by the district court that Payne was a reasonably available

---

[3]If the IRS determines that the taxpayer has committed a crime, it may need to obtain even these documents from third parties so that it can introduce them as evidence at trial. *See, e.g.,* FED. R. EVID. 802(6) & advisory committee's note (requiring that the foundation for introducing business records ordinarily be laid by the "testimony of the custodian" of the records).

source for the information sought. In fact, the district court made no such finding. Although the tenor of the district court's opinion might in places imply that Payne was a reasonably available source of information, the court made no explicit finding to that effect.[4]

As the majority itself describes the requirements of suits based on 26 U.S.C. § 6103(k)(6), three inquiries are involved: (1) whether the information sought is related to enforcing the tax code, (2) whether the information was not "otherwise reasonably available," and (3) whether the disclosure of return information was "necessary" in order to obtain the information sought. No one disputes that the first criterion is satisfied here. The district court and the majority both seem to skip over the second step, and proceed directly to a determination of "necessity."

The questions of whether the information was "otherwise reasonably available" and whether the disclosures were "necessary" are "interdependent." *Barrett v. United States*, 795 F.2d 446, 449 (1986) (hereinafter "Barrett I"). We are concerned in this case with the necessity of three types of disclosures by the IRS: the disclosure of the identity of the taxpayer, the disclosure that the taxpayer is under some kind of investigation, and the disclosure that the investigation into the taxpayer is criminal in nature. It is not possible to identify which of these three types of disclosures by Batista were "necessary" without determining what information was "reasonably available" from Payne. If Payne was not a reasonably available source of some

---

[4]For example, the district court found that Batista contacted third parties "without first determining whether the information was otherwise reasonably available" and that the disclosures to third parties were not necessary in light of the fact that "the information repeatedly offered by Payne was ultimately delivered to . . . the United States Department of Justice." Of course, finding that Batista made no effort to determine whether the information was reasonably available from Payne is not the same thing as finding that the information was in fact available from Payne. And the district court did not make any findings as to the content of the information eventually delivered to the Department of Justice and whether this information was the same or different from that sought by Batista from third parties.

information, then it was okay for Batista to try to get that information from other sources. If it was lawful for Batista to contact third parties, it was also by that fact necessary for him to disclose two kinds of return information: the identity of the taxpayer (Payne) and the fact that the taxpayer was under investigation. Batista could not solicit information about Payne without identifying him. And the very fact that the IRS is asking questions about someone will tip off the third party that the taxpayer is under some kind of investigation. Therefore, if Payne was not a reasonably available source of information, then the only unnecessary disclosure by Batista would be (in the majority's view) the disclosure that the investigation was *criminal* in nature.

But if Payne was a reasonably available source of information, then all of the disclosures were unnecessary: the identity of the taxpayer, the fact of an investigation, and the fact that the investigation was criminal. If Payne was a reasonably available source of information, then Batista could have avoided all of the disclosures to third parties by securing the information from Payne himself.

In *Barrett v. United States*, 100 F.3d 35, 39 - 41 (1996) (*Barrett III*), we explained that the IRS is liable only for the damages occasioned by *unlawful* disclosures)) if some disclosures were permitted, and others not, then the IRS has to pay damages only for the disclosures that were not permitted. *Id.* at 40. In *Barrett III*, the IRS had mailed a number of circular letters to patients seeking information about a plastic surgeon. We explained that, because the information sought was not reasonably available from the doctor, there was nothing wrong with the mere fact that the IRS sent the circular letters. That is, because the information was not reasonably available from the taxpayer, it was not unlawful for the IRS to disclose the identity of the taxpayer and the fact that he was under some kind of investigation. The only unlawful disclosure was the

statement in the body of the letter that the taxpayer was under *criminal* investigation.  *Id.* at 40 n.6.  The doctor was thus required to show that his damages were caused))not by the lawful disclosure of his identity and the fact of the investigation))but by the unlawful disclosure of the criminal nature of the investigation.  *Id.* at 39-40.  If the doctor's medical practice was damaged because patients were worried about their privacy, about the fact of their having had plastic surgery becoming public during an investigation, then the damage would have been done just as effectively by the permitted disclosure that the doctor was under some kind of investigation as the impermissible one that the investigation was criminal.  We therefore required the doctor to show that the patients were worried about the criminality of his behavior, not just their loss of privacy.

The same analysis applies here:  it matters whether Payne was a reasonably available source of information so that we can correctly determine for which disclosures the IRS is liable.  Under *Barrett III*, if Payne was a reasonably available source of the information sought, the IRS is liable for all of the damages Payne suffered as a result of the third party contacts.  If Payne was not a reasonably available source of information, the IRS is liable only for so much of Payne's damages as can be attributed to the disclosure that the investigation was criminal in nature.  If the IRS's disclosure that Payne was under criminal investigation resulted in no more damages than the lawful disclosure that Payne was under some kind of investigation, the IRS is not liable for any of Payne's damages.  It is therefore necessary to evaluate whether Payne was a reasonably available source of the information sought by Batista.

The majority's opinion may be internally contradictory on this point.  It seems to leave undisturbed a supposed finding by the district court that Payne was a reasonably available source of the information sought.  But it then cites the analysis from *Barrett III* explained in the

preceding paragraphs, and proceeds as if the only issue is the damages caused by revealing the criminal nature of the investigation: "we focus on the finding that Batista regularly revealed the *criminal nature* of his investigation of Payne when making third-party contacts" (emphasis in original). If none of the contacts were permissible at all, it does not matter whether the damages were caused by the clients' concerns over privacy or over whether Payne was a tax cheat: any damage from the third-party contact is redressable.

Even assuming for the sake of argument that the district court opinion can be read as finding that Payne was a reasonably available source for all of the information sought, then this conclusion would be clearly erroneous with respect to at least some of the information. Admittedly, for some of the information, Payne might have been an otherwise reasonably available source. For example, Batista contacted the Texas Lawyers Insurance Exchange to find out about $36 in interest income reported by Payne. Batista apparently admitted on the stand that he could have gotten this information (presumably in a sufficiently probative form) from Payne himself. Batista also contacted one of Payne's clients named Neal Talmadge. The sole information sought from this contact was apparently to confirm that Talmadge was a client of Payne, even though Batista had already confirmed that fact from court records. In these situations, the information sought by Batista might very well have been otherwise available without contacting third parties and without disclosing any return information.

But for other types of information sought by Batista, Payne clearly was not an available source of the information. For example, Batista asked a number of people about Payne's

involvement with drug sales.[5]  Payne obviously could not have provided sufficiently probative

information about his own involvement in illegal drug transactions.  So I would find that Payne

was not a reasonably available source for all of the information sought by Batista, and any district

court finding to the contrary is clearly erroneous.

The district court did not make specific findings as to what information sought from third

parties was reasonably available from Payne.  These findings are necessary to a correct

determination of the case, and I would remand to the district court for it to make these

determinations in the first instance.

## II

Assuming that Payne was not a reasonably available source for at least some of the

information sought by Batista, the next issue is whether it was "necessary" for Batista to disclose

during third-party interviews that he was a criminal investigator.  Batista's identification badge

states, in large type, "Criminal Investigative Division;" Batista identified himself as a criminal

investigator when talking to some potential witnesses; and Batista sometimes told third parties

---

[5]The district court apparently believed that any disclosure designed to obtain information about Payne's involvement with drugs was not "necessary," regardless of whether the information was otherwise reasonably available, because Batista had "no rational basis" for thinking that Batista had sold illegal drugs.  Our precedents preclude this line of reasoning.  In *Barrett I* we explained that, in an action under §§ 7431 and 6103, we "do not question the right, wisdom, or necessity of a particular IRS investigation."  *Barrett I*, 795 F.2d at 451.  The question posed by the statute is not whether the information sought is necessary, but whether the disclosures were necessary to obtain the information sought.  *Id.*  As long as the information relates to enforcing the tax laws, the IRS can investigate any crime and look for any information it so desires.   If the IRS wanted to investigate Payne for unreported income from drug sales, then § 6103 poses no bar to its doing so, regardless of whether the IRS had a "rational basis," "probable cause," "articulable suspicion," or any other justification for its investigation.  *DiAndre v. United States*, 968 F.2d 1049, 1053 (10th Cir. 1992) ("[S]ection 6103 does not provide a vehicle to test the probable cause or any other level of justification to investigate.").

that he was conducting a criminal investigation of Payne. In *Barrett v. United States*, 51 F.3d 475, 478 (1995) (*Barrett II*), we held that the IRS needed to produce *trial evidence* of the necessity of disclosing the criminal nature of an investigation in the body of a circular letter. In the absence of evidence to the contrary, the district court was obligated to find that the disclosure was not necessary. *Barrett III* concerned *written* disclosures in a circular letter, not oral disclosures in the course of an in-person interview, as are at issue here. The majority nevertheless feels that *Barrett II* controls and that the IRS was obliged to present trial evidence of the necessity of Batista's disclosures. I disagree.

We interpret statutes according to the plain meaning of the words used. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). There are two senses in which the word "necessary" is commonly used. "Necessary" sometimes means "strictly essential," or an indispensable precondition for the happening of an event. "Necessary" also sometimes means "appropriate or helpful." *Cf., e.g., McCulloch v. Maryland*, 17 U.S. 316, 414 (1819) (interpreting "necessary" in the Constitution's Necessary and Proper Clause to mean the latter of these two definitions, appropriate or helpful).

The first of these definitions has a strictly empirical character: if there is empirically any possible way that an event can happen without the occurrence of the condition, the condition is not necessary. The second of these definitions has both empirical and non-empirical elements. Empirically, we want to know whether or not something is "helpful." For example, are people really more likely to be cooperative or forthcoming in responding to a circular letter if the letter discloses the criminal nature of an investigation? Is the disclosure really "helpful" in getting meaningful replies? But there is also an element of this definition of necessary that looks to

-18-

custom and usage: is the disclosure "appropriate" according to customary standards for handling such situations?

"Necessary" in § 6103 must mean the latter definition)) "appropriate or helpful"))not "strictly essential." In legal contexts, we rarely use "necessary" in the latter sense. *See, e.g., Comm'r v. Heininger*, 320 U.S. 467, 471 (referring to the "commonly accepted meaning" of "necessary" as "appropriate and helpful"). If we were to interpret "necessary" to mean "strictly essential," the statute would be completely unworkable. If this were what were meant by "necessary" in the statute, the IRS could never show that a disclosure was necessary. All that the plaintiff would have to show is that there was some possible way))however infeasible, however impractical, and however otherwise difficult))that could have induced the witness's cooperation without the disclosure.

Congress could not have intended to set such a high barrier. Section 6103 sets up a general rule that return information should be kept confidential. But it then sets out specific circumstances under which return information can be revealed during an investigation. It would not have made sense to have a section creating an exception from the confidentiality rules if the standard for disclosure were so high the exception could never be used. If Congress had intended to prevent the IRS from ever disclosing return information, even during investigations, it just would have left the confidentiality rule in place and not created any exceptions.

Taking "necessary" in the statute to mean "appropriate or helpful," *Barrett II* does not foreclose us from holding that it is necessary for an agent to identify himself truthfully as a criminal investigator when contacting third parties. *Barrett II* focused on the empirical aspects of the word "necessary": whether it really, factually, empirically produces more helpful and

forthright responses to have a circular letter say that the investigation is criminal than not. There is no way to answer this question meaningfully without empirical evidence: the testimony of experienced officers, results from various circular letters that both did and did not include the disclosure, and so forth. In the absence of such evidence, the *Barrett II* court was not prepared to conclude that the disclosure was necessary. Significantly, for circular letters, the other aspect of the word "necessary," the non-empirical aspect that focuses on custom and usage, is not really applicable. There are not any well-developed customs for how the police should solicit information from people in letters.

When it comes to in-person interviews by the police, however, the non-empirical aspect of the word "necessary" becomes very important: we are now concerned not only with whether such disclosures are "helpful" but also with whether they are "appropriate." There is a strong expectation that when a police officer shows up at your door to ask you questions that he identify himself, state the agency for which he works, and show his identification. *Cf. Wilson v. Arkansas*, 514 U.S. 927 (1995) (detailing the common law tradition of requiring the police to identify themselves and "signify the cause of [their] coming" before entering a private dwelling, and incorporating this tradition into the Fourth Amendment inquiry into the "reasonableness" of a search). A regular and commonly expected part of the procedure of being approached by the police is the showing of identification. We do not need "evidence" to help us conclude that it is appropriate for IRS Special Agents to identify themselves and show their badges when conducting interviews: unlike *Barrett II*, the issue is not solely empirical here, it also concerns the customs and usages of the community. *Cf. Dickerson v. United States*, 530 U.S. 428, 443 (2000) (giving importance to the place of Miranda warnings in custom and social expectation, and noting

-20-

"Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture"). In passing § 6103, Congress could not have intended to prevent IRS agents from complying with the widespread expectation that law enforcement agents show their badges and otherwise identify themselves to the people whom they interview.

For circular letters, there was not any relevant custom or usage, so the question of whether the disclosure was necessary was solely an empirical question. Trial evidence of necessity was therefore required. Here, there is a relevant custom, so it is not solely an empirical question. Given social expectations about police identifying themselves, I do not think that empirical evidence would be helpful in ascertaining whether it is appropriate for Special Agents to show their badges or otherwise identify themselves when conducting third party interviews. *Barrett II* is therefore distinguishable, and we should conclude that it is necessary, in the sense of appropriate, for the tax police to identify themselves when approaching third parties about a tax investigation.

The district court and the majority also premise the IRS's liability in part on alleged *written* disclosures made in summonses and letters of the criminal nature of the investigation. The district court found that "Batista issued a large number of administrative summonses and letters to third-parties which disclosed on their face that Payne was under criminal investigation by the IRS." If Batista had disclosed the criminal nature of the investigation in body of letters or summonses, then *Barrett II* would control, and the IRS would be liable for those disclosures in the absence of trial evidence of their necessity.

But I would find that this factual finding by the district court was clearly erroneous. Batista's letters and summonses are part of the exhibits in the record. These documents do not, in

fact, disclose on their face the criminal nature of the investigation.[6]  All of the litigants seem to argue as if, and the majority reasons as if, the only issue is the necessity of Batista's oral disclosures, in apparent recognition of the fact that the written documents do not contain any disclosure of the criminal nature of the investigation.  To the extent that the district court premised liability on the written documents, I would reverse.

## III

I agree with the majority that we should remand for the district court to re-evaluate the good faith issue in light of *Gandy v. United States*, 234 F.3d 281 (5th Cir. 2000).[7]  I also agree

---

[6]Batista used a standard IRS form for the summonses.  The body of the summons states:

> You are hereby summoned and required to appear before David Batista or his designee[,] an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

This statement does not disclose what kind of investigation the IRS is conducting.  The summonses were sometimes accompanied by attachments, listing the documents sought, which also did not disclose the criminal nature of the investigation.  Batista's letters sometimes stated that he was conducting an investigation of Payne, but they did not state that the investigation was criminal.

[7]I note one way in which our approach to this case differs from the approach taken by the *Gandy* court: we decide the question of whether Batista's oral disclosures of the criminal nature of the investigation were "necessary" before moving on to any discussion or consideration of whether the disclosures were in good faith.  *Gandy*, like this case, concerned oral disclosures by IRS agents of the criminal nature of an investigation.  The *Gandy* court decided the good faith issue first, and thereby avoided the issue of whether the disclosures were necessary.  It reasoned that "we need not decide the difficult legal question of whether agents McPherson and Sander's oral disclosures that Gandy was under criminal investigation were necessary if . . . [they were acting] in good faith."  *Id.* at 285.  The *Gandy* court did not consider it necessary to evaluate the "necessity" of the disclosures before evaluating the good faith of the agents.

The *Gandy* court's approach misunderstands the nature of the good faith defense.  We have explained that the good faith defense resembles in many respects the qualified immunity for executive officials described in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  *See Huckaby v. United States*, 794

-22-

that we should dismiss Payne's cross-appeal, challenging the district court's award of damages, as premature.

The majority does not make clear that the IRS, like Payne, may also raise its challenges to the district court's damages and attorneys' fees awards in a subsequent appeal, if a subsequent appeal proves necessary. The IRS argues that Payne did not present sufficient evidence of causation of actual damages and that the district court awarded punitive damages for actions that were not disclosures and were not unlawful. The IRS also argues that its litigating position was "substantially justified," which would preclude the district court's award of attorneys' fees. If the district court finds that Batista acted in good faith, the IRS would not be liable for any damages, and we would not need to consider these issues. I assume that the majority omits mention of these claims by the IRS because the issues might be avoided by the district court's decision on

---

F.2d 1041, 1048 (5th Cir. 1986) ("[T]he good-faith [*sic*] defense in section 7431(b) should be judged by an objective standard analogous to that employed in *Harlow*."); *Gandy*, 234 F.3d at 285. In *Harlow*, the Supreme Court explained that judges applying the qualified immunity test should first determine "the currently applicable law" and only then determine "whether the law was clearly established at the time an action occurred." *Harlow*, 457 U.S. at 818. The reason for this sequence is that we do not want to allow executive officials to violate the law indefinitely. We do not punish officials who make close and difficult, but wrong, decisions about the legality of their decisions. But, the first time a lawsuit is brought challenging a particular kind of official conduct, the courts are supposed to clarify the applicable state of the law so that officials do not make the same mistake in the future. The *Harlow* court therefore required that judges determine the "currently applicable law" before determining whether the law was "clearly established" at the time of the violations. *Id.* The same reasoning would seem to apply under § 7431: courts should first determine whether the IRS agents acted lawfully, and only then whether they acted in good faith.

The statute clearly contemplates that courts should follow this sequence. It permits a defense only for actions relying on "good faith, *but erroneous*" interpretations of applicable law. There is no way to know whether an officer's interpretation was "erroneous" without evaluating the current state of law. Although I joined in the opinion in *Gandy*, I acknowledge that our approach in that case was mistaken. In the future, I would have district courts and panels follow the lead set by the majority here))evaluating first the actual state of the law, and then any good faith defense))rather than the approach followed in *Gandy*.

-23-

remand. I do not read the majority opinion as precluding the IRS from raising these challenges in the future if they prove necessary. With that understanding, I concur in all of the majority's opinion but part VI.